TANGIPAHOA PARISH SCHOOL
BOARD, Petitioner,

v.

UNITED STATES DEPARTMENT OF
EDUCATION, Respondent.

ST. JOHN THE BAPTIST PARISH
SCHOOL BOARD, Petitioner,

v.

UNITED STATES DEPARTMENT OF
EDUCATION, Respondent.

ST. BERNARD PARISH SCHOOL
BOARD, Petitioner,

v.

UNITED STATES DEPARTMENT OF
EDUCATION, Respondent.

ST. CHARLES PARISH SCHOOL
BOARD, Petitioner,

v.

UNITED STATES DEPARTMENT OF
EDUCATION, Respondent.

Nos. 86-4599 to 86-4602.

United States Court of Appeals,
Fifth Circuit.

June 30, 1987.

Brustein & Manasevit, P.C., Michael Brustein, Leigh M. Manasevit, Washington, D.C., Robert B. Mitchell, New Orleans, La., for petitioners.

Ronald B. Petracca, Jr., Jeffrey B. Rosen, Kathryn A. Ellis, Adina Kole, Attys., Maureen Corcoran, Gen. Counsel, Dept. of Educ., Washington, D.C., for respondent.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

POLITZ, Circuit Judge:

These four cases, consolidated for oral argument, are now consolidated for disposition. Before us today are petitions for review of final decisions of the United States Department of Education[1] ordering the school boards in four south Louisiana parishes to refund monies received and spent for the education of elementary students. The four school boards were the recipients of competitive grants made pursuant to Title VII of the Elementary and Secondary Education Act, also known as the Bilingual Education Act, 20 U.S.C. §§ 3221–3262. For the reasons assigned, and to the extent indicated, we grant the petitions for review and remand to the Department of Education for further proceedings consistent herewith.

*Background*

The Bilingual Education Act provides federal funding for programs designed to assist children hampered by the educational impediment Congress termed "limited English proficiency." As defined in pertinent part by the Congress

> The terms "limited English proficiency" and "limited English proficient" when used with reference to individuals means—
>
> (A) individuals who were not born in the United States or whose native language is a language other than English;
>
> (B) individuals who come from environments where a language other than English is dominant, as further defined by the Secretary by regulation;
>
> \* \* \* \* \* \*
>
> and who, by reason thereof, have sufficient difficulty speaking, reading, writing, or understanding the English language to deny such individuals the opportunity to learn successfully in classrooms where the language of instruction is English....

20 U.S.C. § 3223(a)(1). For purposes of this Act, native language "means the language normally used by such individuals, or in the case of a child, the language normally used by the parents of the child." 20 U.S.C. § 3223(a)(2).[2] In regulations

---

1. The Department of Education was created in 1980, successor to the Office of Education. Pub.L. No. 96–88, 93 Stat. 668, 20 U.S.C. § 3401 et seq. Some of the grants were issued by the Office of Education; some were issued by the Department of Education. All actions relative to recovery of grant funds were by the Department of Education and the Secretary of that department. For simplicity, we shall refer herein to the Department and the Secretary.

2. In the House report to the bill defining native language, the conferees stated that it was their intent that "normal usage of a language in a child's environment may also determine that

adopted by the Secretary of Education, dominant language is defined as "the language most relied upon for communication in the home." 45 C.F.R. § 123.03(a).

To be classified as limited English proficient, a child must come from a home that is predominantly non-English speaking and must demonstrate a learning impediment as a consequence of that exposure. Such children qualify for the language enhancement programs envisioned by Congress. Aware that these programs are systemically segregative, Congress specified that

> to prevent the segregation of children on the basis of national origin in programs of transitional bilingual education, and in order to broaden the understanding of children about languages and cultural heritages other than their own,

such programs may include up to 40% non-language-deficient students. 20 U.S.C. § 3223(a)(4)(B).

The regulations encapsulate the definition of an individual with limited English proficiency, relevant to our present inquiry, as one

> Who was not born in the United States or whose native language is other than English;
>
> Who comes from a home in which language other than English is most relied upon for communication;
>
> \*   \*   \*   \*   \*   \*
>
> Who as a result [thereof] has sufficient difficulty in understanding, speaking, reading, or writing the English language to deny him or her the opportunity to learn successfully in classrooms in which the language of instruction is English.

34 C.F.R. § 500.4 (1980). Home is not defined, but native language is defined as "the language normally used by an individual, or in the case of a child, the language normally used by the parents of the child." *Id.*

The Bilingual Education Act provides for the distribution of grant funds on a competitive basis, setting forth various conditions. 20 U.S.C. § 3231(f). The Secretary established specific criteria, along with point valuations, including the need for the project, the instructional approach proposed, and the quality of personnel. 34 C.F.R. § 504.30. The Secretary also established a threshold score for qualifying for the grants. 34 C.F.R. § 501.31.

Four south Louisiana parishes, St. Bernard, St. John the Baptist, St. Charles, and Tangipahoa, successfully competed for the Title VII grants. In their applications they set forth the language deficiencies of their elementary school students, the methods used to determine those deficiencies, and the programs intended to address those educational needs if the grants were awarded. A scan of their applications and a brief reflection on the four parishes aids in our disposition today.

*St. Bernard*

St. Bernard Parish consists principally of a group of islands located southeast of New Orleans. The early settlers came from the Canary Islands, speaking the Spanish of Cervantes. Their descendants came to be known as "Islenos." Subsequently, immigrants from Spain and Santo Domingo, and some Acadians, settled in the parish. On several of the islands, particularly Delacroix, Reggio, Yscloskey, and Shell Beach, Spanish is the primary language, with the dialect reflecting Acadian, French, Portuguese, and Creole influences. This language retention is largely the function of the historical isolation of the Islenos.

In determining need for a bilingual education program, St. Bernard considered a child as limited English proficient if the student had a Spanish ancestry, spoke or understood Spanish, or came from a community where Spanish was the dominant language, and the student fell below the sixth stanine level of performance on a standardized language arts examination. Further, Anglo students exposed to extensive Spanish language or culture in their communities who fell below the sixth level on the examination were classified as limited English proficient.

child's native language." H.R.Conf.Rep. No. 1211, 93d Cong., 2d Sess. 148 (1974).

In determining need St. Bernard used home language surveys, teacher observation reports on the students and their families, census data, and standardized achievement tests. As a result of the data developed, St. Bernard targeted three schools and proposed a program to address the language deficiencies.

St. Bernard's application was approved and funded by the Department of Education for the fiscal years 1979, 1980, and 1981. Throughout the program St. Bernard reported its data to the National Bilingual Resource Center, Lafayette, Louisiana, which conducted assessments of bilingual programs.

*Tangipahoa*

Tangipahoa Parish, in southeast Louisiana, has a large population with Italian ancestry, particularly in the towns of Independence, Amite, Hammond, Natalbany, and Tickfaw. This results from the influx of Italian immigrants to the area as farm laborers at the end of the nineteenth and beginning of the twentieth centuries. To meet its bilingual needs, Tangipahoa submitted a lengthy application in which it detailed a program designed to assist 556 students in the fourth, fifth, and sixth grades. The proposal included a curriculum for bilingual students, and it assayed staff development, training, community involvement, and administration and evaluation of the program.

Tangipahoa identified students who needed and would particularly benefit from the bilingual curriculum by using home language surveys, teacher observation forms, and standardized achievement tests.

Tangipahoa was awarded grants for fiscal years 1979, 1980, and 1981. During this period the Department of Education conducted on-site reviews and annual evaluations. Neither noncompliance nor ineligibility of any program participant was suggested. In April 1980, an official in the Department's Office of Bilingual Education and Minority Language Affairs conducted a favorable site review and reported that Tangipahoa was in compliance with the grant, and that no changes were needed in the original format. The grant was renewed for two additional years.

*St. John the Baptist*

St. John the Baptist Parish, north of New Orleans, is divided by the Mississippi river. Early in the eighteenth century a large number of settlers from the Alsace-Lorraine region of France emigrated to the area. In the 1760's, St. John offered a haven to many French Acadians fleeing persecution in Canada. Census records reflect that nearly a quarter of St. John's population list French as the mother tongue.

Using home language surveys, supplemented by teacher observation reports, and after administering a standardized achievement test, St. John identified children deemed qualified for the federally-funded, language-assistance programs. Its 100–page-plus application set forth the needs perceived, the methodology used to determine the needs, and the details of an educational program to address those needs. St. John's application was approved and its project was funded for fiscal years 1979, 1980 and 1981. During this period, federal education officials conducted on-site inspections and evaluations, applauded the program in writing to St. John school officials, and gave no hint whatever of noncompliance or ineligibility of any participant.

*St. Charles*

St. Charles Parish lies just east of St. John and is also divided by the Mississippi River. Nearly a quarter of its population has French as the mother tongue. St. Charles has one of the largest non-bayou populations of Cajuns in Louisiana. Cajuns are a proud people with a unique heritage and carefully preserved culture. Cajun is a phonetic corruption of Acadian. In the mid-eighteenth century, French Acadians emigrated to Louisiana, as above noted, to escape persecution. During more than a century in English-speaking Canada, those French-speaking settlers were culturally insulated. They left Canada after refusing to swear allegiance to the King of England. After settling in Louisiana the combination of their agrarian occupation, geography,

and language furthered and continued the isolation they had been experiencing.

Cajuns lived off the land, placing little emphasis on formal education because children were needed to work at home. The advent of compulsory education in Louisiana in 1916 compounded cultural problems. The children were taught only in English, a language which was not their native tongue. The French they spoke was not classical or Parisian, but was the composite of the Cajun patois. Cajuns were looked upon as ignorant, adding to their withdrawal and isolation. As a result, many of the Cajun youngsters in St. Charles come from environments in which spoken English is, at best, halting and limited.

In 1977 St. Charles submitted a grant application in which it detailed the perceived need and a program to upgrade the English language skills of students of Cajun descent. This bilingual program was approved and funded from 1978 to 1981 and served kindergarten to third grade in three targeted elementary schools. Officials from the Office of Bilingual Education and Minority Language Affairs conducted site inspections, applauding the conduct of the project. Annual evaluations reflected that project objectives were being achieved.

In 1979 St. Charles submitted a new application, proposing to continue the bilingual program into grades four through six, with an emphasis during the first year on teacher training and curriculum development.

St. Charles employed various means of identifying students deficient in English, including home language surveys, teacher observations, census data, parental consultations, and standardized tests. A student was considered qualified for the bilingual program if he or she spoke French or had parents, grandparents or other relatives at home who spoke French, or came from a community where French was the dominant language, and the student fell below the sixth stanine level in a standardized achievement test of English language skills.

In each of the four parishes, the programs consisted of instruction in English and in the pertinent other language, together with bilingual instruction in the core curricula.

## The Investigations

In late 1980 or early 1981, the Department of Education received letters from citizens complaining that St. Bernard Parish was misusing Title VII funds. In response, an agent assigned to the Office of Investigations conducted a criminal investigation during a three-day unannounced visit on January 27–29, 1981. The Office of Investigations has authority to conduct criminal investigations. 20 U.S.C. §§ 1221e–3(c), 1232f(b). The agent focused on the bilingual and Indian education programs. In addition to receiving no prior notice, St. Bernard was not given an opportunity to see and respond to the agent's findings and conclusions.

On July 20–21, 1981, agents from the Office of Investigations conducted an investigation in Tangipahoa Parish, interviewing seven school board officials and reviewing some of the home language surveys. None of the teacher observation reports or achievement test results were examined. The program detailed in the grant applications had been completed, and the bilingual education teachers were not available; they had returned to Italy. No prior notice of the visit was given. Tangipahoa school officials had no opportunity to review and respond to the agents' findings.

On July 22, 1981, two representatives of the Office of Investigations made an unannounced visit to St. John, conducting a limited investigation much similar to that done in Tangipahoa. That project also had been completed, and most of the instructional staff were away for the summer. Although the teacher observation surveys and standardized test results were available, the agents contented themselves with reviewing only a few of the home language surveys. St. John school officials, like their neighboring colleagues, had no opportunity to respond to or challenge the agents' findings.

These abbreviated inspections by the agents of the Office of Investigations constituted the whole of the "audit" by the Department prior to the issuance of the Final Letters of Audit Determination which are at the core of the decisions against St. John, St. Bernard, and Tangipahoa parishes.

In St. Charles Parish, the Department of Education conducted what appears to be a full audit of the bilingual education program. The agents interviewed school district personnel, analyzed the grant application and evaluation reports, and appeared to review available materials.

### The Administrative Proceedings

In the spring of 1982, the Department, through its Assistance Management and Procurement Service, issued to each of the school boards a "final letter of audit determination," stating that it found each program to be in noncompliance with Title VII, and calling for a refund of the entirety of the funds granted to each parish. The audit letters concluded that ineligible students were participating in the programs and that the programs contained ineligible components, primarily foreign language instruction. The letters called for the following repayments: St. John—$765,603; St. Bernard—$753,205; Tangipahoa—$572,054; and St. Charles—$477,100.29.

The school boards appealed the refund requests to the Education Appeal Board (EAB), a board within the Department established to conduct, *inter alia,* audit appeal hearings. 20 U.S.C. § 1234. St. Bernard, St. John, and Tangipahoa filed several preliminary motions and contended that: the Department could not issue a final letter of audit determination without first performing an audit; the school boards were denied due process; the Department's initial approval and annual evaluations and renewals barred the demands for refunds; and, alternatively, only the amounts allegedly misspent should be refunded, not the entirety of the grants. St. Charles opposed the final letter of audit determination as applying the wrong criteria for determining student eligibility; ignoring funds expend-

ed for teacher training; failing to recognize that the Department's conduct foreclosed its demand for reimbursement; and ignoring the issue of proportional recovery.

Following a hearing, the EAB issued its Initial Decisions, ruling against each of the school boards. Essentially the EAB found that the school boards used a standard for determining student qualification which was broader than that established by Title VII; that the school boards had been afforded due process; that estoppel did not apply against the government acting in its sovereign capacity; and that proportionate recovery was not appropriate. The EAB did not reach the issue of program ineligibility.

On appeal to the Secretary both parties noted that the EAB had not applied the correct legal standard in determining student eligibility, specifically, the EAB had not defined "native language" to include "language normally spoken by the child's parents," as required by both the statute and regulations.

The Secretary remanded the cases to the EAB with instructions to

> make the needed corrections in its statements of the applicable law concerning the definition of [qualified students] and the requirements for the participation of [those students]. The Secretary further instructs the [EAB] to determine whether these changes in the applicable law affect its analysis and conclusions in the four cases and, if so, to amend the Initial Decisions accordingly.

On remand the EAB made cosmetic changes, changed citations to authorities, and then entered Initial Decisions on Remand identical to the Initial Decisions. A close reading of the Initial Decisions and those rendered after remand discloses no basis for concluding that the EAB followed the Secretary's instructions to determine whether the application of the correct law affected its analysis and conclusions. All critical passages are verbatim in the two sets of decisions and there is no additional analysis or evaluation. We find a mere conclusionary statement.

The Initial Decisions on Remand became the Department's final decisions in the matter because the Secretary did not modify or set them aside within 60 days of receipt by the school boards. 20 U.S.C. § 1234a(d). There followed the filing of the instant petitions for review.

### Analysis
### Tangipahoa, St. John and St. Bernard

Tangipahoa, St. John and St. Bernard Parishes contend that under the Elementary and Secondary Education Act, a final audit determination cannot issue without an audit, and that the lack of an audit in this case seriously prejudiced them. The EAB held, and the Department argues, that an audit was not necessary since all that is required on the face of the regulations is "written notice." 34 C.F.R. § 78.3.

Under our standard of review, we must deny the petition for review if we find that the EAB's findings "are supported by substantial evidence and reflect application of proper legal standards." *Bell v. New Jersey,* 461 U.S. 773, 792, 103 S.Ct. 2187, 2198, 76 L.Ed.2d 312, 328 (1983); *See* 20 U.S.C. § 1234d. We conclude, however, that the EAB erred legally when it held that an audit was not required. We are persuaded that Congress imposed that requirement.

■ First, we agree with the school boards that the plain language of the statute and regulations indicates that Congress envisioned that an audit would take place. We are guided by the well-settled principle that "a statute must be interpreted according to its plain language unless a clear contrary legislative intention is shown." *Alabama v. Marshall,* 626 F.2d 366, 368–69 (5th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). The term "final audit determination" is found in § 1234a of the Act and throughout the applicable regulations. Section 1234a is entitled "Audit determinations" and the statute and regulations consistently describe the Department's notice to educational agencies of its investigation as final audit determination. The Department notes that the regulations define final audit determination as "a written notice issued by an

authorized [Department] official disallowing expenditures made by a recipient," which may refer to "the relevant parts of a separate document, such as an audit report." 34 C.F.R. §§ 78.3, 78.11(b)(2). The Department thus reasons that, as long as written notice is given, the notice may be accompanied by any type of report.

This description of the written notice begs the question whether an audit must take place before notice is given. The school boards do not dispute the meaning of "written notice"; rather, they argue that the procedure that must precede this written notice includes a full audit. We conclude that Congress would not have used the word audit in Title VII if it had not intended an audit requirement.

Second, Title I of the Act, which involves grants for "special educational needs," provides for an "Audit Hearing Board," whose purpose is to review final audit determinations made under Title I. When the Education Act was amended in 1978, the EAB was established and it absorbed the functions of the audit hearing board. Title I clearly requires audits to be performed before a final audit determination is made; *see* 34 C.F.R. § 204.42. Those audits previously were reviewed by the audit hearing board. The fact that the EAB now has that function further underscores our conclusion that audits were contemplated by Congress in Title VII cases. The legislative history reflects that the EAB was to expand on the audit hearing board's functions, "to provide a due process hearing procedure for adverse actions taken against recipients by the Office of Education...." H.R.Rep. No. 1137, 95th Cong., 2d Sess. 141, *reprinted in* 1978 U.S. Code Cong. & Admin. News 4971, 5111. We can fathom no intellectually sound reason why Congress would require an audit before a final audit determination in Title I cases, but skip that requirement in companion Title VII cases.

Third, the Department concedes that in the hundreds of final audit determination letters it has issued, including several in Louisiana, it has never before issued a final audit determination without first conduct-

ing an audit. This contemporaneous construction by the Department cannot go unnoticed. The record amply supports the school boards' argument that the Department's policy is to perform audits. The most recent and convincing example of that policy is a memorandum prepared by the Department of Education describing the importance of the audit process in cases involving misuse of Department funds. The memorandum describes the audit process as providing for comments and responses by the auditee, as well as detailed studies of the programs by the auditors, and meetings between the auditors and auditees. We agree with the school boards that the procedure undertaken by the Office of Investigations was inadequate to satisfy the audit requirement intended by Congress and called for by the Department of Education.

■ The Department contends that the criminal investigation substitutes for the audit required by the Act. We do not agree. A civil audit and a criminal investigation are entirely different in critical respects. Notice is demanded for the former and contraindicated for the latter. Wide-ranging interviews generally are done in the former but must be carefully circumscribed in the latter. Collection of evidence is done with relative abandonment in the former, but with a careful eye to constitutional limitations in the latter.

In the cases before us, other than in St. Charles, the investigators appeared without notice, did abbreviated inspections and were gone. The school boards had no opportunity to explain that which might not have been apparent to the agents. For example, the agents looked only to home language surveys. The record clearly reflects that many of those surveys were not completed and returned by the parents of the students. Other steps were taken to determine student eligibility, in particular, teachers made personal observations of the students' English difficulties, in some instances speaking to members of the families. That was an appropriate method of identifying students needing special bilingual attention. The school boards had no

occasion to discuss this with the auditors, for there were no auditors, only criminal investigators.

The bilingual teachers were not asked whether the students indeed were deficient in their mastery of spoken and written English. Finally, a most telling factor, the results of the standardized English language tests were not examined. This should have been a threshold consideration if concern for the purpose of the Act, to assist students hampered by inadequate English language skills, truly fueled the inspectors' engines.

Even if the programs ultimately were to be found to be inconsistent with grant requirements because of a failure of the number of qualified students, it cannot be gainsaid that the programs as described in the applications were consistent with congressional intent. The Act defines a "program of transitional bilingual education" as

a program of instruction, designed for children of limited English proficiency in elementary or secondary schools, which provides, with respect to the years of study to which such program is applicable, structured English language instruction, and, to the extent necessary to allow a child to achieve competence in the English language, instruction in the child's native language. Such instruction shall incorporate the cultural heritage of such children and of other children in American society. Such instruction shall, to the extent necessary, be in all courses or subjects of study which will allow a child to meet grade-promotion and graduation standards.

20 U.S.C. § 3223(a)(4)(A). The Department makes no suggestion that the programs were not successful, or that the participating students did not educationally profit from the classes. There is no suggestion of fraud or ill practice by any school board, only that perhaps there were not enough students who met the requirements of the Bilingual Education Act.

We cannot but note a serious deleterious effect of the Department's position demanding the repayment of hundreds of thousands of dollars. The sums awarded to the four parishes during 1978–1981 were spent for the education of children then

attending school. To require the repayment of those sums today penalizes innocent people, today's students who are sorely in need of a quality education. This court is aware of the financial straits common to all of the affected school systems. Adding to those woes should be done in a most measured and careful manner. We do not see the Department's action in these cases as furthering the obvious federal goals of educating children in bilingual programs.

We grant the petitions of Tangipahoa, St. Bernard and St. John the Baptist parishes, remanding to the Department with instructions to reconsider the matter and, if it decides to proceed against these three parishes, that proper audits be first made. All proceedings undertaken are to be consistent with the statutes and regulations, and with this opinion.

*St. Charles*

■ In the case of St. Charles Parish, the Department conducted an audit and found that fewer than 60% of the students in the bilingual program qualified under the language achievement prong of the text. Most students scored higher than the sixth stanine. The Department also found that available data indicated fewer than 60% of the students came from predominantly non-English speaking homes and that the programs were conducted primarily as foreign language programs.

The record adequately supports these findings. We perceive no purpose in detailing relevant evidence, except to note that although St. Charles described in its application the identification methodology it would use, it did not detail the contents of the home survey. The questions posed in that survey are beyond the pale of the Bilingual Education Act, a fact which, when coupled with the results of the standardized achievement test, supports the EAB's conclusion that an inadequate number of qualified students were in the program.

We likewise find inadequate for the granting of St. Charles' petition for review its contentions that the EAB did not properly consider its evidence and legally erred in its application of the native language requirement. However, we do find merit in the final challenge advanced by St. Charles, specifically, that it should be required to repay only funds expended in a manner clearly inconsistent with the Act. We agree with St. Charles that it should be given a credit for the sums expended on eligible students, including teacher training and related matters, and a reasonable proration of attributable systemwide costs.

The Department's authority to recover funds derives from 20 U.S.C. § 1234a(e), which states in part that

a final decision of the [EAB] under this section upholding a final audit determination ... shall establish the amount of the audit determination as a claim of the United States which the State or local educational agency shall be required to pay....

The regulations provide that

When a grantee has materially failed to comply with the terms of a grant, [the Department] may suspend the grant, ... terminate the grant for cause, ... or take such other remedies as may be legally available and *appropriate in the circumstances.*

34 C.F.R. § 74.113(a) (emphasis added). The Department argues that because St. Charles materially failed to comply with the statutory requirements, refund of the entire grant is required.

■ St. Charles responds that it would not further federal goals to require the refunding of the entire amount. In this instance, as in the instance of the three other parishes, we agree. For although estoppel may not be applied to foreclose actions by the government exercised in its sovereign capacity, *Hicks v. Harris*, 606 F.2d 65 (5th Cir.1979), the equitable factors involved are proper considerations in the determination of appropriate refunding.

St. Charles, like the other parishes, instituted a program for the education of its school children, many of whom had difficulty learning because of their language backgrounds, and all of whom lived in a part of our country unique for its pockets of cultural atavism. Thus, at least with respect to some students, the expenditures furthered the congressional goal of bilingual

education. As in the other three parishes, Department of Education officials reviewed and approved the competitive grant applications. St. Charles, relying on this approval and assuming it was in compliance with Title VII, proceeded with its programs as described. As in the other three cases, the Department did not allege bad faith or that the program was unsuccessful. And as with the other three parishes, it is the children who are currently enrolled in the St. Charles Parish School District who will suffer because of the loss of current school funds. We believe that the EAB should have considered these factors when it determined that full recovery of federal funds was in order.

We accordingly grant in part the petition for review by St. Charles, remanding for reconsideration of the amount to be refunded, with instructions that there be an appropriate articulation of all factors weighed in the analysis and disposition of that determination. Should any of the other three cases reach that point on remand, these observations and instructions likewise shall apply.

The petitions for review by St. Charles, St. Bernard, St. John the Baptist, and Tangipahoa parishes are GRANTED to the extent and for the reasons as set forth in this opinion.