**INGRAM BARGE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 88–1362–OG.**

United States District Court, District of Columbia.

July 28, 1988.

Richard A. Zellner, Mark E. Staib, and Smith R. Brittingham, III of Hahn Loeser & Parks, Cleveland, Ohio, Alan M. Wiseman and Robert M. Bruskin of Howrey & Simon, Washington, D.C., for plaintiff.

George P. Williams, Asst. U.S. Atty., Washington, D.C., for U.S.

Christopher Crowley, Daniel F. Kolb, Margaret M. Ayres, K. Ann McDonald, Jane E. Hewett, and Susan L. Merrill of Davis, Polk & Wardwell, Washington, D.C., Mark Arnold of Husch, Eppenberger, Donahue, Cornfeld & Jenkins, St. Louis, Mo., and Peter Greene of Thompson, Hine & Flory, Washington, D.C., for Consolidated Grain and Barge.

Harold E. Mesirow, Richard D. Gluck and Stephen P. Flott, Lane & Mittendorf, Washington, D.C., for amicus curiae American Waterways Operators.

## MEMORANDUM

GASCH, District Judge.

In a five-count complaint and application for a temporary restraining order, plaintiff Ingram Barge Company ("Ingram") petitioned the Court for review of action taken by the United States Coast Guard ("Coast Guard" or "Agency") authorizing defendant-intervenor Consolidated Grain and Barge Company ("CGB") to operate vessels on American waterways in the coastwise trade. On May 19, 1988, the Court issued a temporary restraining order that dissolved certain Certificates of Compliance ("Certificates") issued to CGB under 46 U.S.C.App. § 883–1 and 46 C.F.R. § 68.01–5(b) (1987).[1] Thirteen days later, Ingram's motion for preliminary injunction was denied, and the Court directed the parties to brief for summary judgment count II of the complaint which alleges a violation of the Administrative Procedure Act, 5 U.S.C. § 706. The cross-motions for summary judgment are now before the Court.[2]

## I.  BACKGROUND

The history of this case is fully recounted in the Court's opinion denying plaintiff's motion for preliminary injunction. *See* Memorandum at 2–6 (June 14, 1988). A digest of that history begins with a proposal by CGB to two Japanese entities—Zennoh and C. Itoh ("Japanese entities")—for the sale of CGB. The assets to be transferred included grain elevators, grain pro-

cessing facilities, and barges. On March 7, 1988, the Japanese entities, which operate an agricultural cooperative and commodities trading business, agreed to purchase CGB.

Ingram, a large coastwise barge line, learned of the contemplated transaction on April 7, 1988. Immediately, Ingram wrote to the Japanese entities stating its belief that the transaction would leave CGB in violation of various maritime statutes. Ingram offered to allay this problem by purchasing CGB's maritime assets. The Japanese entities declined the offer of assistance.

In late April 1988, Ingram also contacted the Coast Guard regarding anticipated applications from CGB for Certificates. Through counsel, Ingram expressed its concern that the sale of CGB would place in foreign hands vessels that operated in the coastwise trade. The company further stated its opinion that, when owned by the Japanese entities, CGB would not qualify as a United States citizen under 46 U.S.C. App. § 808 or section 883–1 of that title.

On May 2, 1988, counsel for CGB confirmed to the Coast Guard the rumored transaction. Contrary to Ingram's opinion, however, the Agency was assured by CGB that it would qualify for Certificates under section 883–1. The Coast Guard was not entirely mollified by CGB's representation and instructed counsel to submit evidence in support of the section 883–1 affidavits which are normally sufficient on their face to constitute a complete application for Certificates.

The Coast Guard reviewed CGB's submissions, which included no more than a list of CGB's officers and directors, and concluded that the Certificates should be issued. On May 18, 1988, Ingram submitted a legal memorandum and additional evidence purporting to contradict the verac-

1. The text of the various maritime statutes involved in this case appears below with the discussion of the history of those statutes.

2. Partially superseded by the cross-motions is the motion by the United States to affirm the issuance of the Certificates and dismiss all re-

maining counts of the complaint. The government's motion for summary judgment effectively requests affirmance of the Coast Guard's decision to issue the Certificates to CGB. The motion to dismiss counts I and III through V is held in abeyance until completion of the Coast Guard's ongoing investigation.

ity of CGB's affidavits. The Coast Guard found this submission devoid of new evidence and issued the Certificates on May 19, 1988 with the caveat that the Agency's investigation would continue.

Contemporaneous with the Coast Guard action, Ingram filed this suit against the Coast Guard to enjoin issuance of the Certificates.[3] Anticipating that the Certificates would be issued despite the lawsuit, Ingram claims in count II that such action by the Agency is arbitrary and capricious and contrary to law. *See* 5 U.S.C. § 706(2)(A). The remaining counts contend that because CGB does not qualify under section 883–1, it is operating vessels in violations of 46 U.S.C.App. §§ 802(a), 808, 883 & 46 U.S.C. § 12106 and that the Coast Guard and the Maritime Administration ("MARAD") have a mandatory duty to enforce these laws which duty they have refused to fulfill. The cross-motions for summary judgment focus on the propriety of the Coast Guard's decision to issue Certificates without completing its investigation and the correctness of its interpretation of 46 U.S.C.App. § 883–1.

## II. THE HISTORY OF LEGISLATION GOVERNING THE COASTWISE TRADE

The nucleus of this case is a statutory scheme that comprehensively controls the ownership of vessels operating in the coastwise trade. Corporate ownership has historically been severely restricted. Before 1825, no vessel documented under United States registry laws could be owned by a corporation. For thirty years thereafter, corporations owned entirely by United States Citizens were permitted to document vessels. The pendulum of reform reached its apex in 1858 when corporations with foreign stockholders became empowered to document and operate vessels in both foreign and domestic trade. The pendulum swung substantially back towards greater restrictions on foreign influence on coastwise activities in 1920 with section 27 of

the Jones Act, ch. 250, 41 Stat. 999 (1920) (codified at 46 U.S.C.App. § 883). As discussed more completely below, section 27 imposed a United States citizenship requirement upon corporations operating vessels on domestic waterways. *See generally* Letter from Sinclair Weeks, Secretary of Commerce, to Warren Magnuson, Chairman, Senate Committee on Interstate and Foreign Commerce (June 3, 1958), *reprinted in* 1958 U.S.Code & Cong.Admin.News 5190, 5195, 5196–97. The momentum of this reversion stuttered somewhat in 1958 when Congress adopted the Bowaters Amendment, which created a "minor exception" to the Jones Act citizenship requirement. Pub.L. No. 85–902, 72 Stat. 1736 (1958) (codified at 46 U.S.C.App. § 883–1). This Amendment is the focus of the controversy in this case.

### A. *The Statutory Scheme That Protects The Coastwise Trade*

Most critical to the statutory scheme are sections 2 and 9 of the Shipping Act of 1916, ch. 451, 39 Stat. 730 (codified at 46 U.S.C.App. §§ 802 & 808), section 27 of the Jones Act, 46 U.S.C.App. § 883, and the Bowaters Amendment, 46 U.S.C.App. § 883–1. The context within which this scheme is to be interpreted is set by Congress' express statement in section 1 of the Jones Act, 46 U.S.C.App. § 861, of the purpose for which domestic maritime activities are protected:

> It is necessary for the national defense and for the proper growth of its foreign and domestic commerce that the United States shall have a merchant marine of the best equipped and most suitable types of vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or national emergency, ultimately to be owned and operated privately by citizens of the United States; and it is declared to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of such a merchant marine, and, *in*

---

**3.** At the hearing on Ingram's application for a temporary restraining order, CGB was permit- ted to intervene as a defendant.

*so far as may not be inconsistent with the express provisions of this Act, the Secretary of Transportation shall, in the disposition of vessels and shipping property as hereinafter provided, in the making of rules and regulations, and in the administration of the shipping laws keep always in view this purpose and object as the primary end to be attained.*

(Emphasis added).

The foundation of the scheme appears in section 9 of the Shipping Act which with exceptions not relevant in this case states:

[I]t shall be unlawful, without the approval of the Secretary of Transportation, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States.

. . . .

Any such vessel, or any interest therein, chartered, sold, transferred, or mortgaged to a person not a citizen of the United States or placed under a foreign registry or flag, or operated, in violation of any provision of this section shall be forfeited to the United States, and whoever violates any provision of this section shall be guilty of a misdemeanor and subject to a fine of not more than $5,000, or to imprisonment for not more than five years, or both.

46 U.S.C.App. § 808 (Shipping Act § 9). This statute perpetuated an historic proscription against foreign ownership of any vessel previously owned by a United States citizen or documented under the laws of this country. Not satisfied merely to re-

strict transfer of American vessels, Congress adopted citizenship and domestic construction requirements for operation of vessels in the coastwise trade:

No merchandise shall be transported by water, or by land and water, on penalty of forfeiture of the merchandise ..., between points in the United States, including Districts, Territories, and possessions thereof embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States, or vessels to which the privilege of engaging in the coastwise trade is extended by [46 U.S.C. §§ 13 or 808]....

46 U.S.C.App. § 883 (Jones Act § 27). Essential to application of these statutes is the definition of United States citizenship which is identical for sections 808 and 883:

[N]o corporation, partnership, or association shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States, and, in the case of a corporation, unless its president or other chief executive officer and the chairman of its board of directors are citizens of the United States and unless no more of its directors than a minority of the number necessary to constitute a quorum are noncitizens and the corporation itself is organized under the laws of the United States or of a State, Territory, District, or possession thereof, but in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.

46 U.S.C.App. § 802(a).[4]

As described by Congress, the composite effect of these maritime statutes was to preclude "a corporation organized under the laws of the United States with alien directors and alien stock control ... from

---

**4.** This prevailing definition of United States citizenship superseded a less stringent meaning which did not require seventy-five percent American ownership of corporations operating

vessels in the coastwise trade. Shipping Act of 1916, § 2, ch. 451, 39 Stat. 729 (superseded by Jones Act, ch. 250, § 38, 41 Stat. 1008 (1920)).

operating a vessel between points in the United States." S.Rep. No. 2145, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.Code Cong. & Admin.News 5190 [hereinafter S.Rep. 2145]. Though consistent with history and the policies of maritime nations, the effect under narrow circumstances was contrary to other policies of the United States. By 1958, dramatic technological advances had created a robust global economy in which foreign ownership of domestic corporations was becoming increasingly common. Congress described the situation in a report accompanying the Bowaters Amendment:

> During the past 38 years the protective legislation has remained unchanged and trading in the coastal and inland waters of the United States has been reserved for United States citizens. Although the principle is as true today as it was 38 years ago, changing times and conditions sometimes dictate that even the best of principles merit *minor exceptions* to the general rule if equity and justice is to be done. Today, there are domestic corporations with large capital investments in the United States whose *unique operation* is unduly restricted due to the provisions of the 1916 and 1920 act. These corporations purchase their raw materials in the United States, give employment to a great number of American citizens and sell their finished product to American purchasers. They are prohibited from transporting their raw materials and finished products upon the inland waters of the United States because all of their officers and directors are not citizens of the United States and 75 percent of their stockholders are not citizens of the United States.

S.Rep. 2145, at 5191 (emphasis added). The circumstances of two companies piqued congressional attention to the impact of the Shipping Act and Jones Act. The Bowaters Southern Paper Corporation ("Bowaters") was incorporated in Delaware and operated principally in Tennessee. Its primary business was the manufacture of newsprint from pulp derived from American trees. The company's entire output was sold in the United States, and nearly all its employees were American. Bowaters was precluded from operating barges and towboats along United States waterways because its stock was entirely owned by a Canadian corporation and its officers and directors were either Canadian or British. *Id.* at 5192.

The Shell Oil Company ("Shell") presented a more extreme example of the occasionally untoward effect of the restrictions against foreign ownership of coastwise vessels. All of the company's officers and nearly all its directors were American. Shell operated entirely within the United States and employed Americans with few exceptions. The company failed to qualify as a United States citizen under 46 U.S.C. App. § 802 because the voting stock of the corporation was held by citizens of the United Kingdom. *Id.*

After reviewing the circumstances of these two companies, Congress concluded that "[i]t would be incongruous for the United States to encourage new industries to be formed within its borders and then impose unrealistic restrictions upon their competitive operations." The resolution of this policy conflict is embodied in the Bowaters Amendment, 46 U.S.C.App. § 833–1:

> Notwithstanding any other provision of law, a corporation incorporated under the laws of the United States or any State, Territory, District, or possession thereof, shall be deemed to be a citizen of the United States for the purposes of and within the meaning of that term as used in [46 U.S.C. App. §§ 808, 835, & 883] ... and the laws relating to the documentation of vessels, *if it is established by a certificate filed with the Secretary of the Treasury as hereinafter provided,* that—
>
> (a) a majority of the officers and directors of such corporation are citizens of the United States;
>
> (b) not less than 90 per centum of the employees of such corporation are residents of the United States;
>
> (c) *such corporation is engaged primarily in a manufacturing or mineral industry in the United States or any*

*Territory, District, or possession thereof;*

(d) the aggregate book value of the vessels owned by such corporation does not exceed 10 per centum of the aggregate book value of the assets of such corporation; and

(e) such corporation purchases or produces in the United States, its Territories, or possessions not less than 75 per centum of the raw materials used or sold in its operations

but no vessel owned by any such corporation shall engage in the ... transportation of merchandise or passengers for hire between points in the United States, including Territories, Districts, and possessions thereof, embraced within the coastwise laws, except as a service for a parent or subsidiary corporation and except when such vessel is under demise or bareboat charter at prevailing rates for use otherwise than in the domestic noncontiguous trades from any such corporation to a common or contract carrier subject to part 3 of the Interstate Commerce Act, as amended, which otherwise qualifies as a citizen under [46 U.S.C. App. § 802] ... and which is not connected, directly or indirectly, by way of ownership or control with such corporation.

....

*A corporation seeking hereunder to document a vessel under the laws of the United States or to operate a vessel exempt from documentation under the laws of the United States shall file with the Secretary of the Treasury of the United States a certificate under oath, ... executed by its duly authorized officer or agent, establishing that such corporation complies with the conditions of this section....* A "parent" or "subsidiary" of such corporation shall likewise file ... a certificate under oath ... establishing that such "parent" or "subsidiary" complies with the conditions of this section.... If any material matter of fact alleged in any such certificate which, within the knowledge of the party so swearing is not true, there shall be a forfeiture of the vessel (or the value thereof) documented or operated hereunder in respect to which the oath shall have been made.

(Emphasis added). The Amendment relaxes the definition of citizenship by eliminating the requirement that seventy-five percent of the stockholders be United States citizens. This stock ownership requirement is replaced by subsections (b) through (e) of the Amendment.

B. *The Provisions Of The Bowaters Amendment Implicated In This Case*

Ingram brought this action against the Coast Guard hoping to prevent the issuance of Certificates to CGB. Although Ingram challenges the Coast Guard's procedure and CGB's capacity to fulfill at least two of the requirements of the Bowaters Amendment, the scope of review by this Court does not encompass all these issues. The questions raised by count II of the complaint are ultimately ones of statutory interpretation, though many are not ripe for review.

Foremost is Ingram's contention that the Coast Guard acted with arbitrariness and caprice when it issued Certificates to CGB despite evidence that CGB did not satisfy the requirements of the Bowaters Amendment. The portion of the Amendment implicated by this argument demands only that CGB file with the Coast Guard affidavits that attest to CGB's compliance with the requirements. Regulations promulgated by the Coast Guard embellish the statutory requirement:

(a) To be formally qualified as an 883-1 corporation for all purposes under the Act, a corporation which meets the requirements of § 68.01-3 must file with the Commandant a certificate under oath as described in Appendix A.

(b) Upon the filing of the certificate required under paragraph (a) of this section, the Commandant will furnish the corporation a Certificate of Compliance....

46 C.F.R. § 68.01-5 (1987). At bottom, Ingram asks the Court to find that the Agency abused its discretion by failing to complete an investigation of CGB prior to issuing the Certificates.

Ingram also characterizes as contrary to law the Coast Guard's interpretation of two words in subsection (c) of the Bowaters Amendment. CGB claims to qualify for Bowaters status because it is "primarily" engaged in "manufacturing." As described by CGB, its subsection (c) activity, which it labels "grain processing," is comprised of receiving, cleaning, drying, sorting, blending, and pelletizing grain.[5] Letter from Peter Greene, Counsel for CGB, to Thomas Willis, U.S. Coast Guard 2 (May 5, 1988) (Administrative Record Tab 12).[6] Ingram contends that these activities leave intact the essential nature of the grain; CGB receives grain from farmers and its processing activity yields grain that is suitable for the same uses as unprocessed grain. The Coast Guard expressed no opinion regarding this dispute.[7]

The second word in subsection (c) about which Ingram and the defendants disagree is "primarily." Ingram would attach this adverb only to an activity as to which all other activities are incidental. Excluded from this interpretation would be activities that constitute merely a majority, plurality, or predominance of a corporation's business. To the contrary, CGB argues, at least, that an activity that comprises the major portion of a corporation's business is the activity in which the corporation is primarily engaged. The yardstick by which CGB would make this determination is gross revenue. Again, the Coast Guard did not offer an interpretation of "primarily."

## III. WAS THE COAST GUARD'S ISSUANCE TO CGB OF THE CERTIFICATES OF COMPLIANCE ARBITRARY AND CAPRICIOUS?

The fundamental question posed by count II of Ingram's complaint is whether the issuance of Certificates to CGB by the Coast Guard was arbitrary and capricious or contrary to law. The simplicity of this question disguises the legion of issues that arise along the path to an answer. The disparate characterizations offered by the parties of the Court's task bespeaks the difficulty to be anticipated in resolving this deceptively simple issue.

From the record, Ingram discerns three basic legal questions:

1. Whether CGB meets the criteria of the Bowaters Amendment?

2. Whether the Bowaters Amendment permits foreign-owned corporations, like CGB, to engage in for-hire transportation in the domestic trade?

3. Whether the Bowaters Amendment relieves CGB from the requirements of sections 808 and 883 that MARAD must authorize CGB to engage in for-hire transportation in the domestic trade?

The record to which Ingram must be looking encompasses much more than the administrative record to which the Court is constrained. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). That record consists primarily of communications among CGB, Ingram, and the Coast Guard concerning the former's eligibility for Bowaters Certificates. In compiling the record, the Coast Guard sought only to make this determination, at least preliminarily. Ingram's second and third questions engender disputes not presented to the Agency and, therefore, not properly reviewable in this Court.

That the Court is constrained to address the first question, however, does not ren-

---

**5.** CGB also described the "fabrication and adaption of machinery and equipment used in grain processing operations" as a "manufacturing" activity in which it is engaged. Without further description of this activity by CGB, it may reasonably be inferred that the activity is incidental to its grain-related business and is not the "manufacturing" in which it contends it is primarily engaged.

**6.** Future citations to the Administrative Record will take the form "Tab ##".

**7.** The absence of any finding by the Coast Guard regarding the meaning of "manufacturing" is not an isolated omission. The Agency's decision to issue the Certificates without prior investigation disabled it from making any findings. Indeed, the Coast Guard has suggested that its responsibility under the Bowaters Amendment and associated regulations is purely ministerial. Rephrased, the argument simply is that the Coast Guard is without authority to deny Certificates to an applicant who files the necessary affidavits.

der trivial the task with which it is faced. Within the realm of the first question, the parties dispute the identity of the agency action subject to judicial review. The Coast Guard states:

> [T]he issue before this court is *not* whether CGB complies with all the requirements of section 883–1. Rather, the decision before the court is whether the Coast Guard's decision that CGB was entitled to receive Certificates of Compliance based upon the affidavits filed by CGB is arbitrary and capricious.

Memorandum of United States in Support of Motion for Summary Judgment at 15–16 [hereinafter Coast Guard SJ Mem.]. CGB envisions a broader role for the Court in this litigation:

> The Coast Guard's decision on the merits, pursuant to the statutorily mandated procedures, to issue the Bowaters certificates on May 19, 1988 is informal agency action that is reviewable by this court.

Memorandum in Support of Consolidated Grain and Barge Company's Motion for Summary Judgment and Dismissal at 20 [hereinafter CGB SJ Mem.]. Remarkably, Ingram agrees with CGB and urges the Court to examine whether CGB satisfies the criteria of the Bowaters Amendment.

█ Neither of these statements accurately describes the agency action with which the Court is concerned. The scope of review suggested by Ingram and CGB is far too broad. Any evaluation by this Court of CGB's capacity to qualify for Bowaters Certificates would be premature. The administrative record is incomplete, and the Coast Guard has not offered an evaluation of CGB's qualifications. In contrast, the Coast Guard's characterization of the case is too narrow. The question is not whether the Certificates may be issued based solely upon affidavits but whether they may be issued following the unusual procedure adopted by the Coast Guard in this case.

More than one month before issuing the Certificates to CGB, the Coast Guard clearly expressed an intention to investigate CGB's qualifications for Bowaters status. *See* Memorandum to File from T.L. Willis,

U.S. Coast Guard (Apr. 25, 1988) (Tab 7) ("[c]ommittment was made to investigate any transaction thoroughly"); Declaration of Thomas L. Willis at 5 (Tab 1) ("[counsel for Ingram] sought and received assurances that the Coast Guard would conduct an investigation into Consolidated's citizenship") [hereinafter Willis Declaration]; Declaration of Captain James C. Card, U.S. Coast Guard, at 2 (Tab 2). In a meeting with the Coast Guard, counsel for CGB was informed that "if ... the Coast Guard determined that Consolidated was eligible under section 883–1, [it] would endevour [sic] to process [CGB's] application" quickly. Memorandum to File from Staff Attorney Lieutenant Oxley, U.S. Coast Guard (May 2, 1988) (memorializing meeting with counsel for CGB) (Tab 9); *see* Willis Declaration at 5–6 (because of challenge by Ingram, Coast Guard "would require submissions in addition to the [affidavit] required by statute ... [and] ... evidence supporting each of five [883–1] eligibility criteria"). Only two days before issuing the Certificates, the Coast Guard again declared that it would examine evidence of CGB's qualification for Bowaters status and withhold the Certificates if the evidence indicated that CGB failed to qualify. *See* Memorandum to File from Staff Attorney, U.S. Coast Guard (May 17, 1988) (Tab 23) ("if [counsel for Ingram] submitted evidence that proved that Consolidated was not eligible under 883–1, [Coast Guard] would have to investigate further before determining whether could issue certificates of compliance"). Regardless of prior administrative practice, therefore, the Coast Guard plainly represented to all parties that CGB's qualifications for Bowaters status would be investigated before any Certificates were issued.

█ Having demanded evidence from CGB and having promised to examine the evidence before issuing any Certificates, the Coast Guard issued Certificates to CGB without completing its investigation. It is this course of conduct that the Court must review. Had the Coast Guard followed its historical procedure of issuing Certificates solely on the basis of the affidavits re-

quired by section 883–1, the Court would not be empowered to examine the propriety of an incomplete administrative investigation. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967) (judicial review must await "formalized" administrative decision); *see also Bell v. New Jersey*, 461 U.S. 773, 778, 103 S.Ct. 2187, 2191, 76 L.Ed. 2d 312 (1983); 5 U.S.C. § 704. Presented with evidence that CGB did not comply with the Bowaters criteria, however, the Coast Guard sensibly chose to undertake an investigation. The question posed to the Court is whether issuance of the Certificates before completion of the investigation was arbitrary and capricious or action taken without proper procedure.[8] 5 U.S.C. §§ 706(2)(A) & (D).

■ This case demands consideration of the lawfulness of *ad hoc* procedures adopted by the Coast Guard, but followed only in part; any factual conclusions reached during this administrative process are not ripe for review. When procedural requirements are specified by statute, the Court's review is "exacting." *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1048 (D.C.Cir.1979). If statutory and regulatory guidelines are absent and the procedure is unprecedented, the Court must verify that notice of the new procedures was given to all concerned parties and that the procedures were followed. Although an agency is "free to fashion [its] own rules of procedure," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978), it may not change the rules as the game progresses. Moreover, because the Coast Guard undertook to issue the Certificates after examination of the merits of CGB's application, its decision may be sustained only if it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'ra-

tional connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)); *see Eagle–Picher Industries v. E.P.A.*, 759 F.2d 905, 921 (D.C.Cir.1985).

A tacit changing of the rules is precisely what occurred in this case. After it received evidence inconsistent with CGB's rumored intention to request Bowaters Certificates, the Coast Guard promised Ingram that an investigation would ensue before the Certificates were issued. CGB was informed that its qualifications for Bowaters status would be examined prior to issuance of the Certificates. By the time CGB filed the affidavits required by section 883–1, the Coast Guard had received legal memoranda, affidavits, and other evidence from Ingram that CGB did not meet the five Bowaters criteria. Although the Coast Guard told CGB that evidence supporting its satisfaction of each criterion would be required, CGB did no more than submit the section 883–1 form affidavits, a list of directors and officers, and a letter from its counsel alleging that CGB met the criteria. With the investigation admittedly incomplete, the Coast Guard issued Certificates to CGB. By this action, the Coast Guard effectively determined that, despite its prior representations to Ingram and CGB, an investigation of CGB's qualifications would not be completed prior to issuing the Certificates.

At the very least, this course of conduct—invention of procedures followed by abrogation of those procedures—is arbitrary and capricious. The Coast Guard cannot reasonably expect to be permitted to adopt new procedural rules without the public participation required by the APA, 5 U.S.C. § 553, and then to ignore those pro-

---

**8.** The Court declines to undertake the broader review suggested by Ingram and CGB. The Coast Guard is currently investigating whether CGB meets the criteria specified in section 883–1, the Bowaters Amendment. Judicial review of this question would be improvident without the more complete administrative record being compiled by the Coast Guard. When that record is complete, Ingram and CGB will have an opportunity to return to this Court to argue the merits of whatever decision the Coast Guard reaches.

cedures. Whether the Coast Guard was obligated to conduct any investigation before issuing Certificates to CGB is irrelevant. Once the Coast Guard stated that it would undertake an investigation, the only permissible course was to complete the investigation before issuing the Certificates. Without a complete investigation, it was not possible for the Coast Guard to render a decision based upon "the relevant data." *Motor Vehicle Manufacturers*, 463 U.S. at 43, 103 S.Ct. at 2866. Moreover, the Coast Guard has failed to provide any explanation of its action. *Id.*

The only meaningful remedy available to Ingram in this case is for the Court to dissolve the Certificates and remand the matter to the Coast Guard for completion of the investigation. Because the Coast Guard has continued to investigate CGB's qualifications since issuing the Certificates, the Court expects that a final decision based on a complete administrative record will be available no later than mid-September. At that time, judicial review of the Coast Guard's factual findings and legal conclusions will be appropriate.

## ORDER

Upon consideration of the Motions for Summary Judgment filed by all parties and the United States' Motion to Dismiss, the oppositions thereto, the record herein, and for the reasons stated in the accompanying memorandum, it is by the Court this 28th day of July, 1988

ORDERED that plaintiff's Motion for Summary Judgment be, and hereby is, granted, in part, and denied, in part, without prejudice; and it is further

ORDERED that the defendants' Motions for Summary Judgment be, and hereby are, denied without prejudice; and it is further

ORDERED that the United States' Motion to Dismiss be, and hereby is, denied as to count II of the complaint and denied without prejudice as to counts I and III through V; and it is further

ORDERED that the Certificates of Compliance issued by the Coast Guard to Consolidated Grain and Barge Company ("CGB") be, and hereby are, dissolved; and it is further

ORDERED that this case be, and hereby is, remanded to the agency for completion of the investigation of CGB's qualifications for Certificates of Compliance under the Bowaters Amendment, 46 U.S.C.App. § 883–1; and it is further

ORDERED that upon completion of its investigation the Coast Guard is empowered to deny or reinstate the Certificates of Compliance; and it is further

ORDERED that immediately upon completing its investigation, the Coast Guard shall file with the Court the administrative record and a notice of its decision regarding the Certificates of Compliance; and it is further

ORDERED that within forty-five (45) days (or the first business day following the expiration of forty-five days) following the filing of the administrative record, Ingram, CGB, or both may file renewed motions for summary judgment.