INGRAM BARGE COMPANY, et al.

v.

UNITED STATES of America, et al.

Consolidated Grain and Barge Company, Appellants.

INGRAM BARGE COMPANY, et al.

v.

UNITED STATES of America, et al., Appellants.

Nos. 88–5262, 88–5285.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1989.

Decided Aug. 15, 1989.

As Amended Sept. 13, 1989.

George Williams, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant in No. 88–5285 and appellees in No. 88–5262.

Christopher Crowley, with whom Peter A. Greene, Washington, D.C., was on the brief for Consol. Grain and Barge Co., appellant in No. 88–5262 and appellee in No. 88–5285. Scott W. Muller also entered an appearance for appellant in 88–5262.

Richard A. Zellner, Smith R. Brittingham, Cleveland, Ohio, Alan M. Wiseman and Robert M. Bruskin, Washington, D.C., were on the brief for appellee, Ingram Barge Co.

Harold E. Mesirow and Richard D. Gluck, Washington, D.C., were on the brief for amicus curiae American Waterway Operators, Inc., urging affirmance.

Before EDWARDS and D.H. GINSBURG, Circuit Judges, and DANIEL M. FRIEDMAN, Circuit

Judge, U.S. Court of Appeals for the Federal Circuit.*

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Consolidated Grain and Barge Company (CGB) and the United States appeal from an order of the district court denying their motions for summary judgment and granting plaintiff Ingram Barge Company partial summary judgment and declaratory and injunctive relief. *Ingram Barge Co. v. United States*, 691 F.Supp. 474 (D.D.C. 1988). Because the district court's order was premised upon an erroneous construction of the relevant statute, we reverse and remand for further proceedings.

## I. BACKGROUND

Section 27 of the Merchant Marine Act, 1920, 41 Stat. 999, provides generally that:

No merchandise shall be transported by water ... between points in the United States ... in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States....

46 U.S.C.App. § 883. This norm is implemented in part through § 9 of the Shipping Act of 1916, 39 Stat. 730, which provides for the documentation of vessels operating between United States ports, and prohibits any party from selling or chartering any such vessel to any person not a citizen of the United States. 46 U.S.C.App. § 808. Section 2 of the Shipping Act provides that a corporation, in order to be deemed a citizen of the United States, must be at least 75 percent owned by citizens of the United States. 46 U.S.C.App. § 802.

In the so-called Bowaters Act of 1958, 72 Stat. 1736 (hereinafter "the Act"), Congress established an exception to these general rules for certain vessels owned by foreign corporations, as well as a procedure for establishing entitlement to that exception, as follows:

Notwithstanding any other provision of law, a corporation incorporated under the laws of the United States shall be deemed to be a citizen of the United States for the purposes of ... that term as used in [*inter alia*, § 27 of the Merchant Marine Act and § 9 of the Shipping Act of 1916], and the laws relating to documentation of vessels, if it is established by a certificate filed with the Secretary of the Treasury as hereinafter provided that—

.(a) a majority of the officers and directors of such corporation are citizens of the United States;

(b) not less than 90 per centum of the employees of such corporation are residents of the United States;

(c) such corporation is engaged primarily in a manufacturing or mineral industry in the United States ...;

(d) the aggregate book value of the vessels owned by such corporation does not exceed 10 per centum of the aggregate book value of the assets of such corporation; and

(e) such corporation purchases or produces in the United States ... not less than 75 per centum of the raw materials used or sold in its operations....

A corporation seeking hereunder to document a vessel under the laws of the United States or to operate a vessel exempt from documentation under the laws of the United States shall file with the Secretary of the Treasury of the United States a certificate under oath, in such form and at such times as may be prescribed by him, executed by its duly authorized officer or agent, establishing that such corporation complies with the conditions of this section above set forth.... If any material matter of fact alleged in any such certificate which, within the knowledge of the party so swearing is not true, there shall be a forfeiture of the vessel ... documented or operated hereunder in respect to which the oath shall have been made.

---

* Sitting by designation pursuant to title 28 U.S.C. section 291(a).

46 U.S.C.App. § 883-1. The Coast Guard regulation implementing the Act, 46 C.F.R. § 68.01–5, provides further that:

    (a) To be formally qualified as [a Bowaters] corporation for all purposes under the Act, a corporation which meets the requirements of [the Act] must file with the Commandant a certificate under oath as described in Appendix A.

    (b) Upon the filing of the certificate required under paragraph (a) of this section, the Commandant will furnish the corporation a Certificate of Compliance.

Appendix A to the regulation contains a form of oath attesting to the corporate applicant's qualifications under each of the five requirements of the Act, quoted above, for a Bowaters exemption.

On May 2, 1988, CGB, a corporation then owned by United States citizens, notified the Coast Guard that it intended to be acquired by two foreign-owned entities. On May 19, CGB filed with the Coast Guard affidavits formally intended to establish its entitlement to a Bowaters exemption for itself and for several subsidiaries. It is undisputed that these affidavits, on their faces, complied with requirements for a certificate under oath set out in Appendix A of the Coast Guard regulation.

Meanwhile, however, Ingram had gotten wind of the proposed transaction prior to CGB's giving notice to the Coast Guard. On April 27, it objected that CGB's acquisition by a foreign agricultural cooperative and a foreign trading company, neither of which, it said, is "engaged in manufacturing operations or mineral extraction in this country," appeared to make CGB ineligible for a post-acquisition Bowaters exemption. Ingram requested "that the Coast Guard promptly investigate the transaction and take appropriate action to enforce the governing statute and regulations."

Following receipt of Ingram's letter, Coast Guard officials met several times, and exchanged letters, with representatives of both CGB and of Ingram, as well as with various other interested parties, including several congressmen and their staffs. In this context CGB, through counsel, represented that it would meet the requirements

for a Bowaters exemption as of the closing date of the proposed transaction. As the district court found in its ruling on an earlier motion, CGB "was informed that the Coast Guard would require 'evidence' supporting the [required] affidavits that are normally sufficient to constitute a complete application for [Bowaters] Certificates." The Coast Guard also informed CGB orally that if Ingram "submitted evidence that proved that [CGB] was not eligible [for a Bowaters exemption, it] would have to investigate further before determining whether could [*sic*] issue certificates of compliance."

Ingram did submit evidence, but it failed to establish CGB's non-eligibility to the Coast Guard's satisfaction. Therefore, on May 19, 1988, the Coast Guard issued the Certificates of Compliance, but it also then advised CGB that, because "strong opposition to the issuance of [the] certificate has been raised by third parties," it intended to "look more fully into the particulars of this corporation in regard to the statutorily prescribed eligibility requirements," and that:

    should [the Coast Guard] determine at a later date that this corporation did not qualify or no longer qualifies as a citizen under [the Act], appropriate action will be taken ... [including] notif[ication of] the Maritime Administration and the Customs Service for appropriate action by those agencies regarding potential violations of statutes under their respective jurisdictions.

On the same day that the Coast Guard issued the Certificates of Compliance to CGB, Ingram filed this action in the district court, alleging that the issuance of a Bowaters Act Certificate of Compliance to CGB on the understanding that it is to be acquired by foreign interests would violate United States shipping laws, and that the Coast Guard and the Maritime Administration had failed to investigate CGB's compliance with the Bowaters Act before issuing the Certificates, in violation of governing law and regulations. It asked that the district court (1) *declare* (a) that the foreign acquisition of CGB would violate the citizenship requirement of § 2 of the Ship-

ping Act and that the acquired company could not be deemed a citizen under the Bowaters Act; (b) that the Coast Guard and the Maritime Administration "have a mandatory duty to investigate the alleged violations of [§ 2] and to enforce the law," and "that the Coast Guard must conduct an investigation to determine whether [the parties to the acquisition] meet the Bowaters criteria; (c) that vessels owned by CGB shall, upon consummation of the transaction, "be permanently ineligible to engage in the coastwise trade ... because they are no longer owned by a United States citizen"; (d) that "vessels previously chartered by CGB from third parties are permanently ineligible to engage in the coastwise trade and are subject to forfeiture ... because they have been chartered to non-United States citizens"; and (e) that merchandise carried in such vessels is subject to forfeiture; and (2) *enjoin* the Coast Guard (a) not to issue the disputed Certificates and (b) to conduct an investigation into CGB's compliance with the Bowaters Act.

The district court held that, due to "the unusual procedure adopted by the Coast Guard in this case," *viz.*, promising a pre-issuance investigation, its issuance of the Certificates of Compliance without conducting such an investigation was arbitrary and capricious. 691 F.Supp. at 481. Although the court had earlier recognized that neither the relevant statutes nor the Coast Guard's regulations require a pre-issuance investigation, and that the Coast Guard's pre-issuance request for additional documentation from CGB was "contrary to the normal practice," it reasoned that, in the course of discussions with CGB, Ingram, and the various other concerned parties, "the Coast Guard plainly represented ... that CGB's qualifications for Bowaters status would be investigated before any Certificates were issued." *Id.* The district court therefore "dissolve[d]" the Certificates of Compliance issued to CGB and its subsidiaries, and remanded the matter for the Coast Guard to conduct an investigation into CGB's compliance with the Bowaters Act. *Id.* at 483. Another panel of this

court stayed the district court order pending appeal.

Following the district court's order, the Coast Guard did then conduct an investigation into CGB's compliance with the Bowaters Act. It found no basis for initiating enforcement proceedings, and no party has challenged that determination, either before the district court or on appeal. On March 21, 1989, this court denied Ingram's motion for leave to file a motion to dismiss the appeal as moot in light of the court-ordered investigation, noting that "it appears that the appeal still presents a live case or controversy"; at the very least, the issue presented would be capable of repetition yet evade review. The only question now before us is whether the district court was correct in finding that the Coast Guard acted arbitrarily and capriciously when it failed in the first instance to conduct an investigation prior to issuing the Certificates of Compliance on May 19, 1988.

## II. ANALYSIS

We agree with the district court that the relevant statutes and regulations do not require the Coast Guard to conduct an investigation into the veracity of a facially valid affidavit submitted by an applicant for Bowaters citizenship status prior to issuing a Certificate of Compliance. We disagree, however, with its conclusion that, because of the "unusual procedure adopted by the Coast Guard in this case," it was bound to investigate CGB's compliance with the Bowaters Act before issuing the Certificates here at issue.

### A. *Requirement of Pre–Issuance Investigation*

██ Ingram, contrary to the district court, maintains that the Bowaters Act requires the Government, prior to issuing a Certificate of Compliance, affirmatively to determine whether the applicant meets the substantive criteria for Bowaters citizenship status. We disagree. The Bowaters Act merely states that (1) a corporation qualifies for citizenship status "if it is established by a certificate filed with the [Government] as hereinafter provided,

that" the corporation meets the five criteria of the Act; and (2) a corporation seeking Bowaters status "shall file . . . a certificate under oath . . . establishing that such corporation complies with the conditions of this section. . . ." On its face, the statute plainly contemplates that qualification under the Bowaters Act is "established" by the filing of the certificate referenced therein, not by a post-filing investigation by the Government into whether the facts contained in the sworn certificate are accurate.

As the defendants point out, moreover, the statute provides a separate mechanism for ensuring the veracity of a certificate filed in support of Bowaters status: "If any material matter of fact alleged in any such certificate is not true, there shall be a forfeiture of the vessel . . . in respect to which the oath shall have been made." From this they argue that Congress cannot have intended the Government to check the accuracy of each representation in the oath prior to issuing a Certificate of Compliance, since, were it required to do so, there would presumably be no need for the stiff penalty for falsification.

Although the statutory language itself does not compel the Government's reading—forfeiture could be imposed for a statement discovered to be false in the course of a pre-issuance investigation—that reading finds strong support in the legislative history of the Act. As originally drafted, the bill that became the Bowaters Act would simply have added a proviso to § 883 stating that it would not apply to corporations meeting the substantive criteria now listed in the Act. H.Rep. No. 2270, 85th Cong. 15 (1958). It did not, however, specify how a corporation's compliance with those requirements would be determined. The Department of the Treasury (which was then the Coast Guard's parent agency) objected to the bill on just that ground, arguing that it could be construed as placing upon the agency the burden of making these substantive determinations. Instead, Treasury proposed the self-certification approach that Congress ultimately adopted, stating:

[T]his agency is of the opinion that the tests proposed for determining whether any corporation is qualified to receive the exemption . . . would be extremely difficult for this Department to apply and would require extensive investigation beyond the capacity of the employees available for the purpose. It would seem to this Department that, if a bill is to be enacted, it would be better to provide for a statement or declaration of qualification to be submitted by the corporation with a provision for appropriately severe civil penalties against the vessel and the corporate officers should it be found that any such statement or any portion thereof has been falsified.

*Id.* at 8.

This legislative history confirms the Coast Guard's view that Congress, in adopting the Act, did not intend that the Government would have to or would investigate whether an applicant is entitled to exemption thereunder. It supports the implication of the substantive provision discussed above, *viz.*, that entitlement to Bowaters status is "established" by the filing of the required certificate—whether such entitlement is falsely "established" being another matter—and does not depend upon any factual investigation by the Government. Regardless of whether the Government is *permitted* to conduct some such investigation and to deny a Certificate of Compliance based upon its findings, we conclude that Congress plainly did not intend to *require* it to do so.

B.  *The Coast Guard's Procedures in This Case*

█ The district court reasoned, however, that despite the absence of any statutory duty to investigate possible non-compliance with the requirements of the Act, the Coast Guard in this case specifically assumed the duty to investigate CGB's application prior to issuing any Certificate of Compliance. In support of this proposition, the court cited to several statements by Coast Guard officials to the effect that a "[c]ommitment was made to investigate any transaction thoroughly," and "assurances [were given] that the Coast Guard

would conduct an investigation into [CGB's] citizenship." The court concluded that the Coast Guard's "course of conduct—invention of procedures followed by abrogation of those procedures—is arbitrary and capricious," and that "[o]nce the Coast Guard stated that it would undertake an investigation, the only permissible course was to complete the investigation before issuing the Certificates." 691 F.Supp. at 481–82.

There are two difficulties with the court's approach. First, it is not clear from the administrative record that the Coast Guard promised to conduct an investigation *prior* to issuing Certificates of Compliance to CGB. Indeed, the Coast Guard took the position during the course of the administrative proceedings, and at least according to a contemporaneous internal memorandum, as late as its May 17 meeting with four congressional staffers, that it had an "affirmative responsibility to issue certificates without delay, but that [it] would investigate and possibly revoke certificates" following issuance. At most, the excerpts from the record cited by the district court, 691 F.Supp. at 481, demonstrate that the Coast Guard represented that it would, at some point, investigate CGB's compliance with the substantive Bowaters criteria and consider prior to issuance any evidence submitted by Ingram that would tend to show that CGB's filing was demonstrably false. The Coast Guard did both of these things, neither of which Ingram challenges; thus the agency cannot be said to have promised more than it delivered. Because the agency did not need to decide whether it could decline to issue the Certificates if it knew prior to issuance that CGB's filing was false—the agency noted that "if [counsel for Ingram] submitted evidence that proved that Consolidated was not eligible under [the Act, the Coast Guard] would have to investigate further before determining whether could [*sic*] issue certificates of compliance"—neither need we reach that question.

Second, even assuming that the Coast Guard did represent that it would conduct a full-scale investigation prior to issuing any Certificate of Compliance, it does not appear that it could delay issuance on that basis without contravening its own regulation. As noted earlier, the regulation implementing the Bowaters Act states that "[u]pon the filing of the certificate required by [the Act], the Commandant will furnish the corporation a Certificate of Compliance...." 46 C.F.R. § 68.01–5. The Coast Guard is bound to follow its own regulations, *see Vitarelli v. Seaton*, 359 U.S. 535, 547, 79 S.Ct. 968, 976, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957), even if they could not, in its view, accommodate the requests of Ingram and others for a full-scale pre-issuance inquiry. Thus, even if the Coast Guard had made and then breached a promise to depart from its own regulation, its departure—not its return to the established course—would be arbitrary and capricious.

## III. Conclusion

For the foregoing reasons, the order of the district court is reversed, and the case is remanded for further proceedings.

*It is so ordered.*