917 F.2d 529
 Lieutenant Colonel Albertis WILSON, Plaintiff-Appellee,
v.
The UNITED STATES, Defendant-Appellant.
 No. 89-1598.
 United States Court of Appeals,
Federal Circuit.
 Oct. 19, 1990.
As Modified on Denial of Rehearing
Dec. 14, 1990.
Rehearing Denied Dec. 17, 1990.
 
 John W. Toothman, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, Md., argued, for plaintiff-appellee. With him on the brief was Alan B. Sternstein. Also on the brief was John D. Grad, Grad & Logan, P.C., Alexandria, Va., of counsel.
 John S. Groat, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief were Lieutenant Colonel Mark A. Steinbeck and Major Robert C. McFetridge, Dept. of Army, of counsel.
 Before NIES, Chief Judge, RICH, MARKEY*, Circuit Judges, BENNETT**, Senior Circuit Judge, NEWMAN, ARCHER, MAYER, MICHEL, PLAGER, LOURIE, and CLEVENGER, Circuit Judges.
 PLAGER, Circuit Judge.
 
 
 1
 In this case, plaintiff, an officer in an Army reserve component, sought back pay, retirement pay, reinstatement and correction of records. His claim was based on 10 U.S.C. Sec. 1163(d), the "sanctuary" provision, which provides that members of a reserve component are, under specified circumstances, protected from involuntary release prior to qualifying for retirement. Before us is an appeal from a judgment of the Claims Court entered May 22, 1989, and reported as Wilson v. United States, 16 Cl.Ct. 765 (1989). Both Lieutenant Colonel (LTC) Wilson and the United States moved in the trial court for summary judgment. LTC Wilson's motion was based on a decision of this court, Ulmet v. United States, 822 F.2d 1079 (Fed.Cir.1987). The Claims Court granted LTC Wilson's motion, holding that he is entitled to sanctuary under Sec. 1163(d). The United States appealed pursuant to 28 U.S.C. Sec. 1295(a)(3). We reverse.
 
 I. The Factual Background
 
 2
 Wilson enlisted in the United States Army on July 5, 1963. In 1965, he received a commission as a second lieutenant in the United States Army Reserve; in 1966 his reserve commission was converted to one in the Regular Army. On February 1, 1980, with the rank of captain, but having twice failed selection to the rank of major, Wilson was discharged from the Regular Army. At the time of his discharge, Wilson had served over sixteen years on active duty.
 
 
 3
 Subsequently, Wilson became a member of the Army Reserve and attained the rank of lieutenant colonel. After performing several active duty for training tours, Wilson received orders to report by October 3, 1983 to Fort McPherson, Georgia, for a special active duty for training (SADT) tour[1] of 179 days, to and including March 28, 1984.
 
 
 4
 While serving on the SADT tour, LTC Wilson wrote to Army headquarters in Washington, D.C. requesting that, because he had now completed more than 18 qualifying years of Army service, he be retained on active duty pursuant to the "sanctuary" provision of 10 U.S.C. Sec. 1163(d). If the Army responded to LTC Wilson's letter, it is not of record. On March 28, 1984, when his SADT tour expired, LTC Wilson was released from his tour of active duty for training and returned to civilian status.
 
 
 5
 On August 10, 1984, Wilson submitted a request that he be recalled to active duty in order to complete 20 years of service for retirement purposes. Army officials disapproved this request by a written response dated October 5, 1984.
 
 
 6
 On January 5, 1985, Wilson's counsel wrote the Secretary of the Army requesting that Wilson be reinstated to active duty so that he could complete his 20 years of active duty and retire with benefits. By a letter dated February 22, 1985, William D. Clark, Principal Deputy Assistant Secretary (Manpower and Reserve Affairs), provided LTC Wilson's attorney, Avery T. Salter, the basis for the Secretary's denial of LTC Wilson's request, stating (in relevant part):
 
 
 7
 Section 1163(d), 10 United States Code, does not give Reserve members who complete 18 years active federal service (AFS) while on Active Duty for Training (ADT) or Special Active Duty for Training (SADT) the right to be continued on active duty solely for the purpose of completing 20 years of service for retirement purposes. Officers on ADT/SADT should understand that future service in an ADT/SADT status is based upon valid requirements as determined by the Department of the Army rather than upon the amount of AFS accumulated by the officer.
 
 
 8
 While Major Wilson is not automatically entitled by law to further active duty, he is neither precluded from such service. However, future service depends upon the existence of a valid requirement and Major Wilson's selection as the best qualified officer available. The Department of the Army retains the right to make such determinations.
 
 
 9
 On August 13, 1987, Wilson filed a complaint in the Claims Court seeking back pay, allowances and benefits from March 27, 1984, reinstatement to active duty, records correction and other relief. On October 14, 1988, the Claims Court issued an interlocutory order, as to liability only, in Wilson's favor on cross motions for summary judgment. The Government petitioned this court for interlocutory review. In an order dated November 18, 1988, we denied the Government's petition. Thereafter, the parties filed stipulated facts as to quantum in the Claims Court. On May 22, 1989, the Claims Court issued its final decision granting Wilson's motion for summary judgment, incorporating therein "with limited modifications" its prior interlocutory order of October 14, 1988. Wilson v. United States, 16 Cl.Ct. at 766 n. 1. The Claims Court held, inter alia, that: under Ulmet v. United States, 822 F.2d 1079 (Fed.Cir.1987), Sec. 1163(d) entitled LTC Wilson to sanctuary; LTC Wilson, having affirmatively sought sanctuary under Sec. 1163(d), was "involuntarily" released from service as that term is used in Sec. 1163(d); and LTC Wilson's involuntary release was not approved by the Secretary in accordance with Sec. 1163(d).
 
 II. The Legal Background
 A.
 
 10
 Although the details of each Service's program may vary, tailored as they are to meet the differing needs of the particular Service, the basic structure of the Federal Government's plan for eligibility for retirement of military officers is fairly straightforward. The plan addresses two basic categories of officers. There are career officers who complete twenty or more years of full-time active military service. These officers typically enter through one of the Service academies or through one of the special officer training programs designed for that purpose.[2] These officers usually are given "regular," as distinct from "reserve" commissions, although some number of officers with initial "reserve" commissions remain in the service and make it a career.
 
 
 11
 By law and regulation, these full-time career officers, both regular and reserve, are entitled to retire from the Service, regardless of age, with a substantial pension upon completion of twenty or more years of service. See 10 U.S.C. Secs. 3911 & 3991 (1988).
 
 
 12
 The system also provides retirement benefits for officers who, although not making a career of military service, complete the requisite number of years of creditable federal service. These may be officers who began with regular commissions and later decided not to make a career of the Service or are terminated involuntarily, but choose to remain affiliated, or they could be officers with an initial reserve commission who, upon completion of their full-time active duty obligation, remain active with a reserve component.
 
 
 13
 This second group of officers, reserve component officers, all of whom will hold commissions in the reserve, may be placed in the active reserve, where, while holding civilian jobs, they regularly drill evenings or weekends as part of the country's citizen soldiery. The purpose is to have a cadre of trained and ready civilians able to augment the full-time forces in time of national need. As part of their readiness training, these officers typically go on an annual period of active duty for training, during which they work side-by-side with their full-time active duty counterparts.
 
 
 14
 Individuals who serve in these reserve components and who earn a total of twenty or more years of qualifying federal service--combining the active duty years with years of qualifying reserve time--are also eligible for a federal pension. Here, though, the pension is considerably less generous: it cannot be drawn until the retired reservist attains age 60, and the monthly stipend is only a fraction of that paid to the career officer who retires with twenty or more years of full-time service. See 10 U.S.C. Secs. 1331, 1333 & 1401 (1988).
 
 
 15
 As a general proposition, whether an officer is retained on either full-time active service or in the reserves after an initial period of full-time active service, is a matter largely in the discretion of the Service concerned, based on the needs of that Service and its applicable rules and regulations, subject of course to governing law.
 
 B.
 
 16
 In 1956, the Congress amended the Armed Forces Reserve Act of 1952 (AFRA), Act of July 9, 1956, Pub.L. No. 84-676, Sec. 265, 70 Stat. 517, by adding a new section, initially codified as Section 1016 of title 50 of the United States Code. Section 1016 had eight subsections, and, according to the Senate Committee report, had two purposes. One was to provide readjustment payments to reservists who were involuntarily released from full-time active duty after an extended period of time in service. The other was to provide some degree of economic security as an inducement to reservists to stay on active duty, thus reducing unwanted attrition and its attendant costs to the Government. The statute did this by providing both readjustment payments to those ushered out before they completed eighteen years of active service, and a guarantee against involuntary separation for those who completed eighteen years, assuring them that they would get their "twenty." This latter purpose was accomplished by subsection (d), which provided that:
 
 
 17
 Under regulations prescribed by the appropriate Secretary, which regulations shall be as uniform as practicable, a member of a reserve component who is on active duty and is within two years of qualifying for retired pay, retirement pay, or retainer pay under any purely military retirement system, shall not be involuntarily separated from that duty before he qualifies for that pay unless his separation is approved by the appropriate Secretary.
 
 
 18
 50 U.S.C. Sec. 1016(d) (Supp. IV 1956) (emphasis added).
 
 
 19
 Subsection (b) of Sec. 1016 provided specific exclusions from "any payments" provided by the provisions of Sec. 1016, one of which exclusions was "A person who is released from active duty for training."[3] In addition, at the time this section was added to AFRA as part of title 50, Sec. 101(b) of title 50 defined active duty as "full-time duty in the active military service of the United States, other than active duty for training." (Emphasis added). The Congressional purpose was clear: if a Service permitted an officer holding a reserve commission to serve on full-time active duty for eighteen years, it could not then terminate that officer's active duty assignment so as to deny the officer the opportunity to complete his or her twenty years and obtain the more desirable federal pension.
 
 
 20
 There are various explanations for this sanctuary provision. As officers rose in rank, a function of, among other things, time in service, the opportunities for promotion diminished--the rank structure is pyramidal. Whether regular officers were favored for retention and promotion over reserve officers is a matter of conjecture. In any event, the Congressional policy was clearly that if reserve commission officers were to be passed over for promotion and retention, at least they could, after enough years, be guaranteed their retirement. In addition, the early 1950's, when the sanctuary provision was enacted, was also a time when many reservists from World War II who had remained in the active reserve were recalled to active duty in Korea. The possibility of completing twenty full-time years was now a viable alternative. While there was no magic to eighteen years as the cut-off, it provided a bright line for which to shoot.
 
 
 21
 In 1962, Sec. 1016 of title 50 was recodified into title 10. In the recodification, Sec. 1016 was severed so that subsections (a), (b), (c) and (f), (g), (h) became Sec. 687(a)-(e), and subsection (d) became Sec. 1163(d). Congress made some minor changes in the language of the statute, none of which were meant to change the substantive effect of the statute.[4] The 1962 version of Sec. 1163(d) read:
 
 
 22
 Under regulations to be prescribed by the Secretary concerned, which shall be as uniform as practicable, a member of a reserve component who is on active duty and is within two years of becoming eligible for retired pay or retainer pay under a purely military retirement system, may not be involuntarily released from that duty before he becomes eligible for that pay, unless his release is approved by the Secretary.
 
 
 23
 10 U.S.C. Sec. 1163(d) (Supp. IV 1962).
 
 
 24
 At the time Sec. 1016(d) of title 50 was recodified as Sec. 1163(d) of title 10, Sec. 101(22) of title 10, in contrast to Sec. 101(b) of title 50, defined active duty to include active duty for training. Other than the general comment that no substantive change was intended, Congress gave no recorded recognition to this difference.
 
 
 25
 Finally, in 1987, Sec. 1163(d) of title 10 was amended by insertion of a parenthetical phrase to expressly provide that active duty does not include active duty for training. Section 1163(d) now reads:
 
 
 26
 Under regulations to be prescribed by the Secretary concerned, which shall be as uniform as practicable, a member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retired pay or retainer pay under a purely military retirement system, may not be involuntarily released from that duty before he becomes eligible for that pay, unless his release is approved by the Secretary.
 
 
 27
 10 U.S.C. Sec. 1163(d) (1988).
 
 III. Discussion
 A.
 
 28
 The issue before us is how should the sanctuary provision of Sec. 1163(d) be read during the intervening years of 1962 to 1987. It is clear that at the time of its enactment, in 1956, and until the 1962 recodification, the sanctuary provision--originally codified as subsection (d) of section 1016 of title 50--by the terms contained in subsection (b) of the same section and consistent with the general definition found in Sec. 101 of title 50, applied only to members of a reserve component on active duty other than active duty for training. And since 1987, the Congress, upon having the issue called to its attention, reaffirmed this original intent by adding clarifying language specifically limiting sanctuary to members on active duty other than for training. In the interim--that is, between 1962 and 1987--as a result of the 1962 recodification, the sanctuary provision stood severed from the remainder of original Sec. 1016, and in a different title (title 10). As such it no longer was adjacent to the limiting exclusions of its original subsection (b), and it now was contained in a title with a definition of active duty that included active duty for training.
 
 
 29
 In deciding the question before us, we begin as in any case of statutory construction with the words of the statute. At the time in question--1984--the statute used the phrase "on active duty," and there was no controlling definition expressly provided in the specific statutory section. There are a variety of types of active duty--the active duty on which a career member serves full-time, the active duty for training on which reservists are ordered for reserve training, the active duty for training referred to as special active duty--and the decision as to which is encompassed in the phrase "active duty" is the issue before us; the Congress can hardly be said to have provided us with a plain meaning on the face of the statute.
 
 
 30
 Yet the problem of ascertaining Congressional intent in this case is not difficult. We are not confronted with lengthy and conflicting committee reports, floor colloquies, and other secondary materials from which we are to divine the intent of the full body of the Congress. Instead we have the clear language of the statute at the time of its enactment, consistent with the definition of the term found in title 50. And we have the clear language of the 1987 amendment, designed to clarify what had been made unclear by the 1962 codifier's reshuffling of the sections. Cf. Bell v. New Jersey, 461 U.S. 773, 784, 103 S.Ct. 2187, 2194, 76 L.Ed.2d 312 (1983) ("the view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value"). The legislative history, if recourse is even needed, is entirely consistent. The House report accompanying the 1962 codification made clear that no substantive change was intended. The sponsors of the 1987 clarification described the added language as necessary to restore the original intent to the language of the section.
 
 
 31
 This case is not unlike Cass v. United States, 417 U.S. 72, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974), in which the Supreme Court construed another provision that was codified in title 10 in 1962. In 1956, Congress enacted a readjustment pay provision, Act of July 9, 1956, Pub.L. No. 84-676, Sec. 265(a), 70 Stat. 517, that granted to certain involuntarily released members of a reserve component having "at least five years of continuous active duty" a readjustment payment computed in part upon the members' "years of active service." Id. at 73 & 79, 94 S.Ct. at 2168 & 2171. For purposes of computing the "years of active service" in determining the amount of readjustment payment, Congress provided the following rounding provision: "For the purposes of computing the amount of readjustment payment (1) a part of a year that is six months or more is counted as a whole year, and a part of a year that is less than six months is disregarded...." Id. at 79, 94 S.Ct. at 2171. In 1962, the language of the 1956 act was codified into Sec. 687(a) of title 10, at which time the rounding provision, which became Sec. 687(a)(2), was changed to read: "For the purposes of this subsection--... (2) a part of a year that is six months or more is counted as a whole year, and a part of a year that is less than six months is disregarded...." Id. at 73-74, 94 S.Ct. at 2168-69 (emphasis added). In effecting the codification, Congress made it clear that it did not intend to make any substantive changes to existing law. Id. at 81, 94 S.Ct. at 2172.
 
 
 32
 The petitioners in Cass argued that, because the language of the rounding provision was changed to read "[f]or the purposes of this subsection," it applied not only to the manner of computing the amount of the readjustment payment, but now it also applied to determining when a member became eligible, i.e., had "at least five years of continuous active duty." In other words, the petitioners were of the opinion that as a result of the codification changes the rounding provision modified the word "years" wherever it was used in Sec. 687(a). Under their interpretation, a member of a reserve component who accrued more than four years and six months, but less than five years, of continuous active service would be entitled to readjustment pay under Sec. 687. The Court held otherwise, however, based, inter alia, on the ground that Congress did not intend to make any substantive changes to the law through the course of codification of the statutes. Id. at 81-82, 94 S.Ct. at 2172.
 
 
 33
 The Secretary of the Army's long-standing interpretation of Sec. 1163(d)--that Service members on ADT are not entitled to sanctuary--provides an independent basis on which we might reach the same conclusion.[5] See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (when a statute is silent or ambiguous with respect to the specific issue, the administrative agency's interpretation, if reasonable, is to be followed by the court).
 
 
 34
 In the face of a consistent record of Congressional intent, to the extent that intent has been expressed, and in light of the Army's consistent, reasonable interpretation of the statute, see Chevron, supra, we conclude that, from its enactment to the present day, the sanctuary provision had one and only one meaning. It applies to a member of a reserve component who is on active duty other than for training, and not to one who, at the relevant time, is on active duty for training (or one of the variants thereof).
 
 B.
 
 35
 The Claims Court in addressing the question of whether LTC Wilson had qualified for sanctuary considered that the issue of his basic eligibility under the statute had been settled by our decision in Ulmet v. United States, 822 F.2d 1079 (Fed.Cir.1987). In Ulmet, the issue was whether a reserve officer could tack active duty for training service on to his prior active duty service (not for training) in order to qualify for sanctuary under 10 U.S.C. Sec. 1163(d) (1982). Id. at 1081. This court reviewed the legislative history of Sec. 1163(d) and held "that the time served by LTC Ulmet on active duty for training is to be included in computing the time required for sanctuary under section 1163(d), and retirement under 10 U.S.C. Sec. 3911." Id. at 1087.
 
 
 36
 The court discussed and rejected the Government's argument regarding the legislative history of Sec. 1163(d), and declined to give weight to the prior administrative and judicial construction that had been given to the section. Though the specific factual issue in Ulmet was different from that being considered today, the underlying legal issue is indistinguishable. We have revisited the legislative history of Sec. 1163(d) in this case. Our examination has brought to light that the legislative history of the sanctuary provision demands a different result from that reached in Ulmet. Accordingly, Ulmet is overruled.[6]
 
 IV. Conclusion
 
 37
 We hold that the phrase 'on active duty' in 10 U.S.C. Sec. 1163(d) does not include active duty for training. Assuming, as did the trial judge, that, for purposes of Wilson's summary judgment motion on the question of sanctuary, Wilson's status was active duty for training, it follows that he was not, on that basis, entitled to sanctuary.[7]
 
 
 38
 The grant of summary judgment in Wilson's favor is vacated, and the case is remanded to the Claims Court for further proceedings consistent with this opinion.
 
 
 39
 VACATED AND REMANDED.
 
 
 40
 ARCHER, Circuit Judge, concurs in the result.
 
 
 41
 MAYER, Circuit Judge, dissenting.
 
 
 42
 In my view there are two profound errors in the court's disposition of this case. First, it violates the sound jurisprudential precept of stare decisis: when a court makes a decision, especially construing a statute, it should not revisit the issue absent extraordinary circumstances. Second, for the reasons amply explained in Ulmet v. United States, 822 F.2d 1079 (Fed.Cir.1987), whatever Congress thought it was doing when it revised 10 U.S.C. Sec. 1163(d) in 1962, and notwithstanding the Army's wishful administrative gloss, the statutory language does not support today's belated interpretation.
 
 
 43
 Only recently, in Patterson v. McLean Credit Union, 491 U.S. ----, ----, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989), the Supreme Court reemphasized the importance of stare decisis in preserving the rule of law and in ensuring that its evolution is not subverted by arbitrariness:
 
 
 44
 The Court has said often and with great emphasis that "the doctrine of stare decisis is of fundamental importance to the rule of law." Although we have cautioned that "stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision," it is indisputable that stare decisis is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon "an arbitrary discretion."
 
 
 45
 Our precedents are not sacrosanct, for we have overruled prior decisions where the necessity and propriety of doing so has been established. Nonetheless, we have held that "any departure from the doctrine of stare decisis demands special justification." We have said also that the burden borne by the party advocating the abandonment of an established precedent is greater where the Court is asked to overrule a point of statutory construction. Considerations of stare decisis have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done. [Citations omitted.]
 
 
 46
 To be sure, the Court posited situations that might be seen as special justification for overruling an earlier construction of a statute, id. at ----, 109 S.Ct. at 2370, but none of them applies here. Our court alludes to the 1987 amendment to section 1163(d), but does not suggest that it purported to change the statute as it stood between 1962 and 1987. At best some of the legislative history suggests an attempt by one or two legislators to give a meaning to the law its wording will not sustain. The fact is, however, that in the 1962 recodification "active duty for training" was included in the definition of "active duty." The drafters may not have intended a substantive change, but that is what they wrought. This is not an intervening legislative development which removes or weakens the "conceptual underpinnings" of an earlier decision, id. at ----, 109 S.Ct. at 2370, the nearest thing to justification for today's ruling. Whether the 1987 amendment undercut Ulmet 's conceptual underpinnings would depend on whether it were effective retroactively. If so, Ulmet would be superseded; if not, then Ulmet should continue to control the diminishing number of cases that may have arisen between 1962 and 1987. Because it contains no language of retroactivity, the amendment is prospective only.
 
 
 47
 There are two conflicting lines of Supreme Court cases dealing with retroactivity. The shorter and more recent line culminates in Bradley v. Richmond School Board, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), which held that the law in effect at the time a court renders judgment applies unless it would result in manifest injustice or there is statutory direction or legislative history to the contrary. The longer, historical line of cases, of which Bowen v. Georgetown University Hospital, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), is the current standard-bearer, says that absent specific direction to the contrary, a new statute applies prospectively only. See Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. ----, ----, 110 S.Ct. 1570, 1579, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring). In Sargisson v. United States, 913 F.2d 918, 922-23 (Fed.Cir.1990), we cast our lot with the Bowen camp, which has the benefit of fairness and common sense.
 
 
 48
 One legislator said of the 1987 amendment that it "restores" (that is to say, puts back what was left out) the pre-1962 coverage of section 1163(d). 133 Cong.Rec. S18344 (daily ed. Dec. 17, 1988) (remarks of Sen. Glenn). But the fact remains that until 1987 the plain meaning as this court concluded in Ulmet was that active duty for training counted in qualifying for sanctuary. It was not apparent that Congress had a different rule in mind until 1987. Even then, if it wanted to make the amendment retroactive, it could have included words suitable to that purpose. Accordingly, the 1987 amendment does not justify overruling Ulmet. The court's contrary action is tantamount to retroactive application of the statute as amended in 1987 to facts arising in 1983 in the absence of congressional direction.
 
 
 49
 The same arguments that the court adopts today were made and rejected in Ulmet. Perhaps today's decision is the better policy. But the trouble is, through intention or inattention, it is not what Congress wrote. It is not our office to legislate the "better" policy. Tennessee Valley Auth. v. Hill, 437 U.S. 153, 194, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978). Our duty is to apply what Congress enacted, not what we think it should have enacted. And this is doubly true when we are overruling an earlier decision for no better reason than that a group of judges is persuaded by arguments that did not earlier prevail before another group of judges.
 
 
 50
 Federal Rule of Appellate Procedure 35(a) says that there are two prime reasons for taking a case en banc: "(1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance." This case satisfies neither of them. There is, of course, no conflict between Ulmet and any other case in this court (or the Supreme Court, see Fed.Cir.R. 35(a)). Nor is this a "question of exceptional importance." As far as we can tell, it has affected only a handful of officers in 25 years and, until Ulmet, never even reached a court of appeals.
 
 
 51
 But the undoing of Ulmet is a matter of exceptional importance. It is a pernicious practice which the rule of stare decisis is meant to avoid, and ensures that little in this court will ever be settled. It thwarts those who might otherwise order their affairs on the basis of our putatively definitive judgments, especially on subjects for which we are the only appellate court short of the Supreme Court. It holds out to litigants the likelihood that the court may change its mind on any matter, large or small, seemingly on whim, and will incite appeals in the face of supposedly settled precedents without any special justification, a practice we already bemoan.
 
 
 52
 A final, unrelated, infirmity in this case is the composition of the court in contravention of 28 U.S.C. Sec. 46(c). Our internal procedures require circulation of draft dispositions to the entire court, during which time a panel is free to modify, augment, withdraw or, indeed, reverse its tentative judgment and opinion. Accordingly, until disposition of a case is announced to the public, it is not "decided."
 
 
 53
 The panel in this case circulated a draft which accommodated Ulmet. When the case was taken en banc sua sponte by the court after at least one member of the panel belatedly changed his mind, the panel's draft disposition became null and this entirely new disposition of the case ensued. There having been no "decision" of the court issued by the panel that originally heard it, the case is now proceeding as though on hearing en banc not re hearing en banc. Section 46(c) does not contemplate senior judges sitting on hearings en banc. In my view, the judgment is therefore invalid. Cf. United States v. American-Foreign Steamship Corp., 363 U.S. 685, 691, 80 S.Ct. 1336, 1340, 4 L.Ed.2d 1491 (1960) (vacating judgment reached by illegally composed en banc court of appeals under earlier version of section 46(c)).
 
 
 54
 I respectfully dissent.
 
 
 
 *
 Circuit Judge Markey vacated the position of Chief Judge on 27 June 1990, and was succeeded by Judge Nies
 
 
 **
 This case was taken in banc by vote of the active judges. It was initially heard by a panel consisting of Judges Markey, Plager, and Senior Judge Bennett. A majority of the court being of the view that 28 U.S.C. Sec. 46(c) does not bar such participation, once the in banc court was convened Senior Judge Bennett, as a member of the panel, participated in the subsequent in banc proceedings
 
 
 [1]
 Active duty for training tours range in duration from 1 to 179 days. According to the Government, the Department of Defense defines "Active Duty for Training (ADT)" as:
 An ADT tour under orders providing for automatic reversion to inactive duty status when the specified period of ADT is completed. ADT includes full-time attendance at formal specialized skill training, flight training, combat crew training, and professional development education programs intended to provide RC [Reserve Component] members with necessary skills and disciplines supporting RC missions. Special AD [Active Duty] for activities having a primary training content also is authorized as ADT [Special Active Duty for Training (SADT) ].
 Brief for Appellant at 5 n. 5 (citing Department of Defense Directive No. 1215.6, Uniform Reserve, Training and Retirement Categories).
 
 
 [2]
 Career officers may also be recruited from the enlisted ranks
 
 
 [3]
 50 U.S.C. Sec. 1016(b) (Supp. IV 1956), in pertinent part, provided:
 (b) Persons not entitled to payment. (Emphasis in original)
 The following persons are not entitled to any payments under this section:
 (1) A person who is released from active duty at his own request.
 (2) A person who is released from active duty for training. (Emphasis added).
 It is arguable that subsection (b) was not intended to apply to subsection (d). Subsection (b) refers to "any payments." While the consequences of the guarantee under subsection (d) are retirement payments, the subsection itself is in the nature of a guarantee of opportunity for eligibility for payments. These two subsections are discussed in the legislative history as follows:
 The proposal is designed primarily to provide a readjustment payment for Reserve officers involuntarily released from active duty; the following classes of persons would not be entitled to such payments: * * * (2) those released from active duty for training; * * * *.
 By special provision, a Reserve officer on active duty and within 2 years of qualifying for retired or retirement pay could not be involuntarily separated from active duty before he so qualifies except with the approval of the Secretary of the military department concerned.
 Acceptance of readjustment pay would not deprive a person of any retired or retirement pay or other retirement benefits from the United States to which he would otherwise become entitled. * * * *.
 S.Rep. No. 2288, 84th Cong., 2d Sess. 2, reprinted in 1956 U.S.Code Cong. & Admin.News 3061, 3066 (letter from Robert T. Stevens, Secretary of the Army, to Hon. Sam Rayburn, Speaker of the House of Representatives (June 4, 1955)) (emphasis added).
 
 
 [4]
 The Senate Report states:
 This bill, as amended, is not intended to make any substantive change in existing law. Its purpose is to bring up to date title 10 of the United States Code, by incorporating the provisions of a number of public laws that were passed while the bill to enact title 10 into law was still pending in the Congress, and to transfer to title 10, provisions now in other parts of the code.
 Some changes in style and form have been made to conform the provisions to the style and form of title 10 as it now exists, but these changes do not affect the substance of any of the laws dealt with.
 S.Rep. No. 1876, 87th Cong., 2d Sess. 2, reprinted in 1962 U.S.Code Cong. & Admin.News 2456.
 
 
 [5]
 See, e.g., Letter from James D. Hopson, LTC., U.S. Army Congressional Coordinator, to Senator Rudy Boschwitz (Dec. 23, 1987); Letter from William D. Clark, Principal Deputy Assistant Secretary, to Avery T. Salter, Jr. (Feb. 22, 1985); and Army Reg. 135-200, p 4-7(b)(4) (1983)
 
 
 [6]
 The dissent's solicitous concern for stare decisis is well stated but misplaced. The problem is not that we here overrule Ulmet, but that Ulmet overruled a longstanding administrative practice of the Government based on an interpretation of statutes going back more than thirty years. That this longstanding interpretation was what Congress intended was clearly evidenced by its 1987 amendment. We disagree with the dissent that this was not an intervening legislative development which removed or weakened the 'conceptual underpinnings' of an earlier decision (quoting from Patterson v. McLean Credit Union, 491 U.S. ----, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)); the intervening legislative development destroyed them. As the dissent correctly observes, "Our duty is to apply what Congress enacted...."
 The question of the retroactive effect, if any, of the 1987 amendment on other cases is not before us. Retroactivity has no bearing on this case, and thus the dissent's discussion of the issue is not on point.
 
 
 [7]
 Wilson has contested the issue of whether he was on active duty for training, arguing that his status was properly classified as active duty. Following the remand, the trial court will have that undecided issue before it."